Filed 10/17/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| ELVIA VELASCO JIMENEZ,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>U.S. CONTINENTAL MARKETING, INC.<br>et al.,<br><br>    Defendants and Respondents. | D075532<br><br><br>(Super. Ct. No. RIC1604613) |

APPEAL from a judgment of the Superior Court of Riverside County,

Daniel A. Ottolia, Judge.  Affirmed in part; reversed in part and remanded with

directions.

Levin & Nalbandyan, A. Jacob Nalbandyan and Charles L. Shute, Jr., for Plaintiff

and Appellant.

Littler Mendelson, Uliana Kozeychuk and Philip L. Ross, for Defendants and

Respondents.

Elvia Velasco Jimenez asserted claims under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.)[1] against her contracting employer[2] U.S. Continental Marketing Inc. (USCM), a manufacturing company that negotiated with Jimenez's direct employer Ameritemps, Inc. (Ameritemps), a temporary-staffing agency, for her employment.[3] Jimenez's claims required a threshold showing that USCM was her employer. Disputing that assertion at trial, USCM framed the inquiry as a contest of relative influence between the direct and contracting employers, asking the jury during closing arguments, "Did [USCM] have control over plaintiff *more than the temp agency*?" (Italics added.) The jury agreed with USCM and returned a special verdict finding that USCM was not Jimenez's employer. Jimenez moved for a new trial, unsuccessfully, and judgment was entered in favor of USCM. On appeal, Jimenez argues that there is insufficient evidence to support the special verdict finding and asks that we reverse the judgment.

[1]     All statutory references are to the Government Code unless otherwise indicated.

[2]     Because the nomenclature of temporary-staffing varies in the caselaw, we specify our terms here. As used in this opinion, a "temporary-staffing agency" is an entity that hires individuals who are placed with third-party entities for temporary or long-term work. Individuals hired by the temporary-staffing agency for this purpose are "direct employees" of the temporary-staffing agency and "temporary employees" of the third-party entities, which we refer to as "contracting employers." "Employee" refers to direct and/or temporary employees. Likewise, "employer" refers to direct or contracting employers. Here, Ameritemps is a temporary-staffing agency and direct employer of Jimenez; USCM is a contracting employer of Jimenez; and Jimenez is a direct employee of Ameritemps and temporary employee of USCM.

[3]     Jimenez also asserted these claims against Nelson Cuellar, a direct employee of USCM with whom she worked.

To evaluate whether an entity is an employer for FEHA purposes, courts consider the totality of circumstances and analyze several factors, principal among them the extent of direction and control possessed and/or exercised by the employer over the employee. (*Vernon v. State of California* (2004) 116 Cal.App.4th 114, 118 (*Vernon*).) In the particular case of temporary-staffing, factors under the contractual control of the temporary-staffing agency (such as hiring, payment, benefits, and timesheets being handled by a temporary-staffing agency) are not given any weight in determining the employment relationship with respect to the contracting employer. (See *Bradley v. Department of Corrections & Rehab.* (2008) 158 Cal.App.4th 1612, 1619 (*Bradley*).) The inquiry with respect to the contracting employer is considered individually, not in relation to that of the direct employer. (See *ibid*.) There is no contest of relative influence as framed by USCM in its closing argument.

The facts relevant to the specific and narrow question presented here are not in dispute. Just like in *Bradley*, the contracting employer here did not hire the temporary employee, pay her, provide her benefits, or track her time—all of which, according to USCM, amounts to substantial evidence in support of the jury's finding. (See *Bradley*, *supra*, 158 Cal.App.4th at pp. 1623–1624.) But because those factors are outside the scope of the terms and conditions of the temporary employee's employment with the contracting employer, they do not bear on the issue. As the *Bradley* court helpfully explained, "[t]he key is that liability is predicated on the allegations of harassment or discrimination involving the terms, conditions, or privileges of employment *under the*

3

*control of the employer*, and that the employment relationship exists for FEHA purposes within the context of the control retained." (*Id.* at p. 1629.)

Undisputed evidence demonstrates that USCM exercised considerable direction and control over Jimenez under the terms, conditions, and privileges of her employment. (See *Bradley*, *supra*, 158 Cal.App.4th at 1629.) And although the parties contest the characterization of Jimenez's termination, the appropriate inquiry in the temporary-staffing context is whether the contracting employer terminated the employee's services for the contracting employer (which USCM did), not whether the contracting employer terminated her employment with her direct employer (which USCM did not do). (See *ibid*.)

Accordingly, without expressing any opinion as to the ultimate merit of Jimenez's claims, we reverse the judgment as to three of those claims and, for reasons explained below, affirm the judgment as to one. As to the three remaining, we remand for a new trial at which the jury should be instructed that USCM was Jimenez's employer.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Foundational Facts*[4]

The relevant facts are neither complicated nor disputed. USCM, a manufacturing company that makes shoe care products, relies on temporary employees for much of its workforce and contracts for employees' services with Ameritemps. Jimenez worked for

---

[4] Our discussion focuses on the facts directly relevant to the specific legal issue presented—whether USCM was Jimenez's employer—and omits the facts underlying Jimenez's claims against USCM and Cuellar.

4

USCM as either a direct or temporary employee for five years before her employment was terminated. At that point, she was performing a supervisory role as a line lead in USCM's production department, overseeing as many as thirty colleagues, including both temporary and direct employees of USCM. Jimenez's supervisor was a direct USCM employee.

Jimenez, like USCM's other temporary employees, was placed with USCM at Ameritemps' direction. Ameritemps pays these individuals for the services they perform for their contracting employer, as well as any associated benefits. It also tracks the employees' time by using a clock that it provides. USCM maintains the ability to terminate the services of any of its temporary employees, which it exercises in the same circumstances in which it would terminate the employment of a direct employee. USCM cannot, however, terminate Ameritemps' employment relationship with Ameritemps' employees.

The relationship between USCM and Ameritemps includes a history of temporary employees becoming direct USCM employees and vice versa, sometimes multiple times. Direct and temporary employees work alongside each other at USCM's production area using equipment provided by USCM, and they are both sent to the same USCM clinic for on-the-job injuries. Additionally, temporary and direct employees supervise and train (and, in turn, are supervised and trained by) both temporary and direct employees. Likewise, USCM's employee handbook and accompanying policies apply to all employees, including both direct and temporary employees. In other words, in terms of

5

the day-to-day work experience with USCM, there is virtually no difference between direct and temporary employees.

Pursuant to applicable company disciplinary procedures, USCM investigated Jimenez as a result of bullying complaints made against her. It concluded that Jimenez had violated the company's antibullying policy and issued a warning (through a direct USCM employee) pursuant to its progressive disciplinary process that calls for initially coaching underperforming workers, then retraining them, and if ultimately unsuccessful, terminating their employment.

During this same time period, Jimenez raised allegations of harassment against her coworker Nelson Cuellar, first to USCM and then to Ameritemps. USCM and Ameritemps investigated and held meetings with Jimenez, Cuellar, and several other employees. They concluded that the allegations could not be corroborated and decided against disciplining Cuellar or Jimenez.

USCM later terminated Jimenez's services. Jimenez was made aware of USCM's decision through a USCM employee and was escorted from the building by USCM personnel. Shortly thereafter, Ameritemps also terminated Jimenez's employment.

B.    *Procedural Overview*

In April 2016, Jimenez filed a complaint against USCM and Cuellar, alleging five causes of action under FEHA[5] and a sixth claim under the common law for wrongful

---

5    Jimenez alleged (1) a hostile work environment based on sex; (2) failure to prevent harassment; (3) sex and gender discrimination; (4) failure to prevent discrimination; and (5) retaliation.

termination in violation of public policy.[6] Prior to trial, the court granted summary

adjudication as to the discrimination-related third and fourth causes of action. The case

proceeded to trial on the four remaining claims, with the jury returning a verdict in favor

of USCM and Cuellar.

Across all claims, the jury made five special verdict findings. On the two special

verdict forms for the hostile-work-environment-based-on-sex claim,[7] it responded "No"

(by a nine to three margin) to the question, "Was Elvia Velasco Jimenez an employee of

U.S. Continental Marketing, Inc.?" On the verdict form for the retaliation claim, the jury

responded "No" (by a nine to three margin) to the question, "Was Elvia Velasco Jimenez

employed by U.S. Continental Marketing, Inc.?" Likewise, on the verdict form for the

wrongful discharge in violation of public policy claim, the jury responded "No" (by a

nine to three margin) to the question, "Was Elvia Velasco Jimenez employed by U.S.

Continental Marketing, Inc.?" Finally, with respect to the alleged failure to prevent

harassment or retaliation, the jury responded "No" (by an 11 to one margin) to the

question, "Did U.S. Continental Marketing, Inc. fail to take all reasonable steps to

prevent the harassment or retaliation?"

After the verdicts, Jimenez filed a motion for a new trial, arguing that the jury's

finding—that USCM was not Jimenez's employer—was contrary to law. Opposing the

---

[6]     Jimenez initially named Ameritemps as a defendant but later dismissed it from the action.

[7]     Two forms were used to distinguish between the entity and individual defendants.

7

motion, USCM pointed to six facts that it believed showed USCM was not Jimenez's employer. Specifically, USCM asserted that: (1) "[USCM] did not hire [Jimenez]"; (2) "[Jimenez's] paychecks came from Ameritemps, not [USCM]"; (3) "[USCM] did not exercise any control over the decision to terminate [Jimenez]"; (4) "[Jimenez's] termination letter came from her employer, Ameritemps, on their letterhead, not from [USCM]"; (5) "there were two separate sets of time clocks at [USCM] premises, one for the employees and one for the temps, which clock was installed and monitored by Ameritemps"; and (6) "when asked questions about her most recent job, [Jimenez] testified about her most recent job that she was placed as a janitor at Target by her actual employer, and did not claim that Target was her employer (as she did with [USCM])." The court denied the motion, and judgment was entered in favor of USCM and Cuellar.

DISCUSSION

A.    *Standard of Review*

The facts bearing on the specific question presented here are not in dispute. Instead, the parties contest the characterization and legal significance of these facts with respect to whether, under the relevant statutes and regulations, USCM may be held to be Jimenez's employer. (See § 12940, subd. (j).) We therefore review the question under a de novo standard, which applies to interpretations of statutes and to mixed questions of law and fact when legal issues predominate. (See *Bradley*, *supra*, 158 Cal.App.4th at pp. 1623–1624; *Crocker Nat'l Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.)

8

B.      *The Employment Relationship for FEHA Purposes in the Temporary-Staffing Context*

FEHA's purpose is to protect and safeguard the right and opportunity of all persons to seek and hold employment free from discrimination.  (See *Brown v. Superior Court* (1984) 37 Cal.3d 477, 485.)  To this end, FEHA makes it unlawful for an employer to harass or retaliate against an employee.  (See § 12940.)  To be entitled to relief for allegations of harassment and retaliation, a FEHA claimant must first demonstrate an employment relationship with his or her alleged employer.  (See *Bradley*, *supra*, 158 Cal.App.4th at pp. 1623–1624.)

FEHA does not define "employee," but the administrative agency charged with interpreting FEHA—the Fair Employment and Housing Council (FEHC)—does define the term.  (See § 12935; see also *Bradley*, *supra*, 158 Cal.App.4th at p. 1625.)  We give great weight to an administrative agency's interpretation of its own regulations and the statutes under which it operates.  (*Colmenares v. Braemar Country Club*, *Inc*. (2003) 29 Cal.4th 1019, 1029.)  The FEHC defines "employee" as "[a]ny individual under the direction and control of an employer under any appointment or contract of hire or apprenticeship, express or implied, oral or written."  (Cal. Code of Regs., tit. 2, § 11008, subd. (c).)  FEHA thus requires an employment relationship, but that relationship need not be direct.  (See *Vernon*, *supra*, 116 Cal.App.4th at p. 123.)  Instead, the employment relationship must show the employer's exercise of direction and control over the employee—the common-law "keystone of the employment relationship"—and other factors outlined in *Vernon.*  (*Bradley*, *supra*, 158 Cal.App.4th at pp. 1625−1626; *Vernon*,

9

at p. 123.)  Direction and control may be shown by, among other factors, whether the employee must obey instructions from the employer and whether "there was a right to terminate the service at any time." (*Bradley*, at p. 1625, citing *Villanazul v. City of Los Angeles* (1951) 37 Cal.2d 718, 721.)

The FEHC's regulations further provide that "[a]n individual compensated by a temporary service agency for work to be performed for an employer contracting with the temporary service agency may be considered an employee of that employer for such terms, conditions and privileges of employment under the *control* of that employer. Such an individual is an employee of the temporary service agency with regard to such terms, conditions and privileges of employment under the *control* of the temporary service agency." (Cal. Code of Regs., tit. 2, § 11008, subd. (c)(5), italics added.) As the court in *Bradley* explained, "[t]his language reflects that the employment relationship for FEHA purposes must be tied directly to the amount of control exercised over the employee." (*Bradley*, *supra*, 158 Cal.App.4th at pp. 1625–1626.) The court continued, "[t]he key is that liability is predicated on the allegations of harassment or discrimination involving the terms, conditions, or privileges of employment *under the control of the employer*, and that the employment relationship exists for FEHA purposes within the context of the control retained." (*Id.* at p. 1629.) In other words, the direction and control held by a contracting employer over a temporary employee may not be discounted by the absence of factors relating to control that are outside of the bounds of the contractual context, which in the temporary-staffing context typically include the hiring, payment, benefits, and time-tracking being handled by the temporary-staffing agency. This general

10

principle—that an individual may be held to have more than one employer in the temporary-staffing context—has "long been recognized . . . for the purposes of applying state and federal antidiscrimination laws." (*Id*. at p. 1626, citing *Mathieu v. Norrell Corp.* (2004) 115 Cal.App.4th 1174, 1184.)[8]

Our analysis is guided significantly by *Bradley*. There, a social worker in a temporary employee position with the California Department of Corrections and Rehabilitation (CDC) brought harassment and retaliation claims under FEHA against the CDC. (*Bradley*, *supra*, 158 Cal.App.4th at pp. 1617–1618.) The jury found for Bradley on both causes of action, but the court granted CDC's motion for judgment notwithstanding the verdict as to the retaliation claim, finding that she lacked standing. (*Id*. at p. 1618.) The Court of Appeal reversed in relevant part, concluding the social worker was "an employee within the meaning of the FEHA, even though she [was] not an

---

8    This principle is sometimes referred to as the joint employer or dual employer doctrine, which can create confusion. (See *Scheidecker v. Arvig Enterprises*, *Inc.* (D. Minn. 2000) 122 F.Supp.2d 1031, 1038 [joint employer]; *Kowalski v. Shell Oil Co.* (1979) 23 Cal.3d 168, 174 [in a personal injury context, " '[w]here an employer sends an employee to work for another person, and both have the right to exercise certain powers of control over the employee, that employee may be held to have two employers—his original or "general" employer and a second, the "special" employer' "], citing *Riley v. Southwest Marine*, *Inc.* (1988) 203 Cal.App.3d 1242, 1247–1248 ["where an employer lends an employee to another employer and relinquishes to the borrowing employer all right of control over the employee's activities," a "dual employment" situation is created].) Although the terms "joint employer" and to a lesser extent "dual employer" might suggest one employer or employment relationship made up of two or more constituent parts, the principles relevant here may be more easily understood and applied by simply discarding the somewhat-dated assumption that an employee typically has, or ought to have, a single employer. After all, the temporary-staffing context is only one subset of many possible cases in which an individual may have more than employer.

11

official employee of the state for civil service and benefit purposes." (*Id*. at pp. 1617, 1629.)

Much like the circumstances here, Bradley was not hired by the CDC, did not receive her payments or benefits from the CDC, and instead "worked at the facility as a contract worker pursuant to a contract negotiated between CDC and the [temporary-staffing agency]," which "contracted with Bradley to work at and provide services to the facility." (*Bradley*, *supra*, 158 Cal.App.4th at p. 1618.) Additionally, Bradley's time was managed by the temporary-staffing agency through timesheets. (*Ibid*.) In this way, the scenario was typical of the temporary-staffing context, such that the "CDC use[d] contract workers on a regular basis when needed to supplement regular staff." (*Ibid.*) Yet the court found that such factors did not affect the employment relationship between Bradley and CDC for FEHA purposes, instead focusing on the exercise of direction and control within the context of the terms, conditions, or privileges of Bradley's employment *with CDC*. (*Id*. at pp. 1629–1631.) Thus framed, the court found significant evidence of direction and control and reinstated the jury verdict on the retaliation claim. (*Id*. at pp. 1629–1631, 1635.)

C.     *There Is Insufficient Evidence to Support a Finding that Jimenez Was Not an Employee of USCM for Purposes of FEHA*.

With respect to the issue presented here—whether USCM is Jimenez's employer for the purposes of FEHA—Jimenez argues that "no evidence even arguably relevant to the issue supports the jury's verdict." USCM maintains substantial evidence supports the jury's finding, reciting many of the same facts presented in opposition to Jimenez's new

12

trial motion. Specifically, (1) USCM did not hire Jimenez, who was instead placed at USCM by Ameritemps; (2) USCM did not track Jimenez's time; (3) USCM did not pay or provide benefits to Jimenez; and (4) "it was Ameritemps who terminated Jimenez, not [USCM]." USCM identifies no other evidence rebutting Jimenez's evidence of an employment relationship or otherwise tending to show that USCM was not Jimenez's employer.

Under FEHA, the first three of USCM's factual bases are not entitled to any weight, as they do not bear on USCM's control over Jimenez's work performance. (See *Bradley*, *supra*, 58 Cal.App.4th at pp. 1625−1626 & fn. 2.) The termination of employment may be considered, but only within the specific employment relationship at issue. (See *id.* at pp. 1625, 1629.) In other words, the relevant question here is whether USCM terminated Jimenez's relationship *with USCM*, not whether USCM terminated Jimenez's relationship *with Ameritemps*. Although the parties dispute the characterization and import of the facts surrounding Jimenez's termination, they do not contest that USCM terminated Jimenez's services with USCM. We accordingly can identify no substantial evidence to support the jury's special verdict finding that USCM was not Jimenez's employer.

On the other side of the ledger, considerable evidence shows that USCM exercised direction and control over Jimenez's employment. Jimenez worked in a supervisory role as a line lead in USCM's production department with responsibility for thirty colleagues, including temporary and direct employees of USCM, and she reported to a USCM employee. She was subject to USCM's employee handbook and benefitted from USCM's

13

mandatory in-house training and the availability of USCM's clinic used by direct and temporary employees for any on-the-job injuries. She was subject to USCM's disciplinary policies, and was in fact investigated by USCM as a result of bullying complaints made against her. After concluding that Jimenez had violated USCM's antibullying policy, USCM issued a warning (through a direct USCM employee) pursuant to its progressive disciplinary policy. USCM investigated the harassment allegations that Jimenez raised and could have disciplined her as a result of the investigation, though it declined to exercise this power. And Jimenez worked in a system in which direct USCM employees supervise and train (and are supervised and trained by) temporary employees.

USCM argues that the absence of some facts that may be relevant should weigh in its favor, noting, for example, that no evidence was introduced to demonstrate ownership of the equipment provided by USCM for its temporary employees to utilize on its property during their employment. But FEHA does not require that a claimant present evidence related to every possible factor that might bear on the question of an employment relationship, and the absence of some indicia of employment does not affect Jimenez's extensive showing of an employment relationship with respect to USCM under FEHA.

USCM additionally contends that Jimenez misreads *Bradley* and improperly attempts to extend the joint employer doctrine such that "every time a staffing agency sends a worker to one of its clients, that client is a joint employer." It goes on to claim that any such argument is barred by the invited error doctrine because Jimenez agreed to

14

submit the "employer" question to the jury with an instruction telling jurors they "may" find a joint employer relationship—not that they "must." (See *Transport Ins. Co. v. TIG Ins. Co.* (2012) 202 Cal.App.4th 984, 1000.)

Contrary to USCM's contention, we do not read Jimenez to argue on appeal that a jury "must" necessarily find an employment relationship as to all direct and contracting employers in the temporary-staffing context (described by the jury instruction as "[w]here an employer sends an employee to do work for another company, and both have the right to exercise certain powers of control over the employee"). It is true that in the trial court Jimenez advocated for a legal conclusion broader than ours here. She contended that "there can never be a scenario where a staffing agency sends an employee to work for a client, yet a jury finds no employment between the worker and the client." We do not read the FEHA statutes, the FEHC's regulations, *Bradley*, or other relevant caselaw to establish such a bright-line rule, and we do not adopt one here. Instead, we consider the totality of circumstances through the lens of a temporary staffing dynamic or other contractual framework, which means simply calibrating the analysis of relevant factors like the extent of direction and control to reflect the particular employment context. Consequently, where a FEHA claimant presents substantial evidence of an employment relationship that is rebutted only by direction and control evidence outside the bounds of the contractual context (such as in a temporary-staffing situation where hiring, payment, benefits, and time-tracking are handled by a temporary-staffing agency), the claimant has demonstrated an employment relationship for FEHA purposes. Accordingly, there is no issue of invited error.

15

D.    *Jimenez's Common Law Claim*

The parties do not address the distinction between Jimenez's FEHA claims and her common law claim for wrongful discharge in violation of public policy with respect to Jimenez's employment relationship with USCM.  But as discussed in *Bradley*, the principles supporting the primacy of the direction and control factor under FEHA are firmly rooted in the common law.  (See *Bradley*, *supra*, 58 Cal.App.4th at pp. 1626–1628 [finding an employment relationship under either FEHA or the common law]; see also *Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167, 170; *Casella v. SouthWest Dealer Services*, *Inc.* (2007) 157 Cal.App.4th 1127, 1138–1139.)  Accordingly, for the same reasons discussed above with respect to the FEHA claims, we likewise find that USCM was Jimenez's employer for the purposes of her common law claim.

E.    *Jimenez's FEHA Claim for Failure to Prevent Harassment or Retaliation*

On all claims but one, the jury's special verdict findings were limited to the question of the employment relationship between Jimenez and USCM.  But with respect to Jimenez's failure-to-prevent claim, for reasons that are not entirely clear the jury was not asked about the employment relationship and instead proceeded to the merits.  It found, by an 11 to one margin, that USCM did not "fail to take all reasonable steps to prevent the harassment or retaliation."  Neither Jimenez nor USCM challenges the jury's finding or otherwise addresses the matter in their briefing.  Accordingly, we affirm the judgment as to this individual claim.

16

DISPOSITION

The judgment with respect to Jimenez's FEHA failure-to-prevent claim is affirmed (second cause of action). In all other respects the judgment is reversed and the case is remanded to the superior court for a new trial on Jimenez's two FEHA claims for a hostile work environment based on sex and retaliation (first & fifth causes of action), as well as her common law claim for wrongful termination in violation of public policy (sixth cause of action). As to each of those claims, the jury should be instructed on retrial that USCM was Jimenez's employer. Jimenez shall recover her costs on appeal.

DATO, J.

WE CONCUR:

McCONNELL, P. J.

AARON, J.

17